IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge R. Brooke Jackson

Civil Action No 13-cv-01749-RBJ

CECO CONCRETE CONSTRUCTION, LLC,

      Plaintiff,

v.

CENTENNIAL STATE CARPENTERS PENSION TRUST,

      Defendant.

---

CENTENNIAL STATE CARPENTERS PENSION TRUST, and
BOARD OF TRSUTEES OF THE CENTENNIAL STATE CARPENTERS PENSION TRUST

      Counter-Plaintiffs,

v.

CECO CONCRETE CONSTRUCTION, LLC,

      Counter-Defendant.

---

## ORDER

---

This case is before the Court on parties' cross-motions for summary judgment.

Plaintiff/counter-defendant seeks enforcement of an arbitration award entered pursuant to 29

U.S.C. §1401(a)(1) of the Multiemployer Pension Plan Amendment Act of 1980 ("MPPAA"), an

amendment of the Employee Retirement Income Security Act of 1974 ("ERISA").

Defendant/counter-plaintiffs ask this Court to overturn the arbitrator's decision and instead issue

a judgment in their favor.  Jurisdiction is proper under 29 U.S.C §1401(b)(2).  For the reasons

explained below, the plaintiff/counter-defendant's motion is now granted, and the defendant/counter-plaintiffs' motion is now denied.

## I.  LEGAL BACKGROUND

"ERISA was designed to ensure that employees and their beneficiaries would not be deprived of anticipated retirement benefits by the termination of pension plans before sufficient funds have been accumulated in them." *Concrete Pipe & Products of California, Inc. v. Constr. Laborers Pension Trust for S. California*, 508 U.S. 602, 607 (1993).  Soon after ERISA was enacted, Congress became concerned about the financial trouble many plans were facing, a problem exacerbated by the fact that the potential liability employers faced upon termination of a plan created an incentive for them to withdraw from weak plans.  *Id.* at 608.  To address this problem, the MPPAA was enacted to impose "withdrawal liability" on employers choosing to withdraw.  *Id.* at 609.  However, "in enacting the MPPAA Congress recognized the transitory nature of contracts and employment in the building and construction industry with a specific exception" for such employers.  *Carpenters Pension Trust Fund for N. Cal. v. Underground Constr. Co.*, 31 F.3d 776, 778 (9th Cir.1994).  Under the exception, an employer incurs withdrawal liability only if it (1) ceases to have an obligation under a multiemployer plan and (2) continues or resumes work in the same jurisdiction.  29 U.S.C. § 1383(b)(2).  At issue in this case is whether plaintiff/counter-defendant Ceco Concrete Construction ("Ceco") performed work in Colorado after ceasing to have an obligation to defendant/counter-plaintiff, the Centennial State Carpenters Pension Trust ("the Plan"), thus incurring liability despite the construction industry exception.

The MPPAA also provides a procedure to resolve such disputes.  Under 29 U.S.C. § 1399(b)(1), once an employer has notified a plan of its intent to withdraw and provided any

requested information, the plan assesses that employer's withdrawal liability.  If the employer

disagrees with the plan's liability determination, it may ask the plan to review any specific matter

relating to the determination.  29 U.S.C. § 1399(b)(2).  Any further dispute about the employer's

liability shall be resolved through arbitration pursuant to 29 U.S.C. §1401(a).  Finally, "[u]pon

completion of the arbitration proceedings in favor of one of the parties, any party thereto may

bring an action, no later than 30 days after the issuance of an arbitrator's award, in an appropriate

United States district court . . . to enforce, vacate, or modify the arbitrator's award."  29 U.S.C.

§1401(b)(2).  This case is before the Court pursuant to this statutory provision.

## II.  UNDISPUTED FACTS

The parties agree on essentially all of the facts relevant to this dispute.[1]  Ceco is an

"employer" under ERISA §§ 3(5) and 3(14)(C), and the Plan is a multiemployer plan, an

employee benefit plan, and a defined benefit plan within the meaning of §§ 3 and 4001.  ECF

No. 1 at ¶¶ 4, 5; ECF No. 8 at ¶¶ 4, 5.  Ceco was formerly a signatory to collective bargaining

agreements for employees performing carpentry work in Colorado, under which it was required

to make contributions to the Plan.  ECF No. 1 at ¶ 6; ECF No. 8 at ¶ 6.  The last such agreement

expired on April 30, 2010.  ECF No. 1 at ¶ 7; ECF No. 8 at ¶ 7.

The present dispute began when, on March 3, 2011, the Plan assessed withdrawal liability

against Ceco in the amount of $917,904.00, payable in quarterly installments of $38,697.00.

ECF No. 1 at ¶ 8; ECF No. 8 at ¶ 8.  Ceco requested that the Plan review its liability

determination and then initiated arbitration in accordance with 29 U.S.C. §1401(a).  ECF No. 1

at ¶¶ 9, 10; ECF No. 8 at ¶¶ 9, 10.  The parties agreed to have the arbitration administered by the

---

[1] The facts are drawn from the agreed-upon facts in the parties' complaints and answers, as well as facts stipulated to in arbitration and found by the arbitrator.  There is a presumption, rebuttable only by a clear preponderance of the evidence, that the findings of fact made by the arbitrator are correct.  29 U.S.C §1401(c).  The court has reviewed the full record and has not found any basis for doubting any of the arbitrator's factual findings.

American Arbitration Association ("AAA"), AAA Number 7762122211 DECR, and the case was submitted to Arbitrator Norman Brand. ECF No. 1 at ¶ 10; ECF No. 8 at ¶ 10. During the pendency of the arbitration process, Ceco made the requisite withdrawal payments to the Plan pursuant to 29 U.S.C. § 1399(c)(2). ECF No. 1 at ¶ 11; ECF No. 8 at ¶ 11.

Multiple issues were presented to the arbitrator. ECF No. 1 at ¶ 12; ECF No. 8 at ¶ 12. On June 23, 2012, Arbitrator Brand issued an Interim Award and Opinion ("Interim Award") in favor of Ceco as to the first issue in the case, which involved the Plan's "common control" theory of liability. ECF No. 1 at ¶ 12; ECF No. 8 at ¶ 12. In stipulated facts, the parties agreed that Ceco and Heico Holdings, Inc. ("Heico")—Ceco's corporate parent—had been under "common control" for a number of years. Unified Record ("UR") at 100 ¶ 3. They also stipulated that Heico acquired Concrete Frame Associates, Inc. ("CFA") on October 1, 2010, five months after Ceco withdrew from the Plan, and that with that acquisition, Ceco, Heico, and CFA came under "common control." *Id.* at 101 ¶¶ 4, 7, 8. Furthermore, CFA has performed work in Colorado of the type for which contributions to the Plan would have been required if it had been performed by Ceco. *Id.* at 101 ¶ 9. The Plan argued that CFA's post-acquisition work triggered Ceco's withdrawal liability under ERISA's common control provision, ERISA §4001(b)(1), 29 U.S.C § 1301(b)(1). *Id.* at 93. However, the arbitrator disagreed in the Interim Award, finding that "the 'common control' proviso of ERISA §4001(b)(1) does not make CFA's work Ceco's work, and does not trigger withdrawal liability for Ceco." *Id.* at 99.

On June 7, 2013, the arbitrator issued a Final Award and Opinion ("Final Award") resolving the remaining issues in the case,[2] holding that Ceco had not incurred withdrawal liability, and ordering the Plan to refund Ceco the $348,273.00 it paid while the arbitration was pending. ECF No. 1 at ¶ 14; ECF No. 8 at ¶ 14. Specifically, the Final Award rejected the two

---

[2] The Final Award was later modified to make minor factual corrections. UR at 1106–07.

theories that the Plan put forth as bases for Ceco's withdrawal liability.  First, the arbitrator

found that Ceco and CFA were not a single employer, and thus Ceco was not subject to

withdrawal liability on that theory.  UR at 1124.  Second, the arbitrator rejected the Plan's

contention that because Ceco sold work back to a contractor to avoid withdrawal liability, it must

be deemed to have done the work and thereby incurred liability under ERISA §4212(c).  *Id.*

Finally, the arbitrator incorporated the earlier Interim Award by reference.  *Id.* at 1109.

Ceco now seeks an order confirming the Final Award and awarding Ceco $348,273.00

plus interest, costs and expenses, and attorney's fees.  ECF No. 1 at ¶ 17.  The Plan, joined by

the Board of Trustees of the Plan ("the Board"),[3] filed counterclaims, asking that the Court

vacate the arbitrator's awards, enforce the Plan's withdrawal liability assessment of $917,904.00

against Ceco, and award the Plan/the Board interest, costs, and attorney's fees.  ECF No. 8,

Counterclaims, at 13.  Specifically, the defendant/counter-plaintiffs argue that the arbitrator erred

in his conclusions about Ceco and CFA's common control status, Ceco and CFA's status as a

single employer, and the legal implication of Ceco's transaction undertaken with the purpose of

evading or avoiding liability.  *Id.* at ¶¶ 17–31.  Both sides have moved for summary judgment.

ECF Nos. 38, 39.

### III.  DISCUSSION

Before analyzing the merits of the parties' arguments, the Court will first lay out the

summary judgment standard and then determine the appropriate standard of review to apply in

considering the arbitrator's findings on each issue.  The Court then turns to the merits of each

finding.

### A.  **Summary Judgment Standard.**

---

[3] Ceco opposes the Board's participation in this action.  Because the resolution of the issues before the Court is not impacted by the Board's presence as a party, the Court declines to address the appropriateness of the Board's participation.

"Summary judgment is appropriate 'if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law.'" *Utah Lighthouse Ministry v. Found. for Apologetic Info. & Research*, 527 F.3d 1045, 1050 (10th Cir. 2008) (quoting Fed. R. Civ. P. 56(c)). In examining a motion for summary judgment, the Court considers "the factual record, together with all reasonable inferences derived therefrom, in the light most favorable to the non-moving party . . . ." *Id.* The moving party has the burden of producing evidence showing the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). In challenging such a showing, the non-movant "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute about a material fact is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

**B.   The Applicable Standards of Review.**

The present case is before the Court pursuant 29 U.S.C §1401(b)(2), which provides for district court review of an arbitrator's award. §1401(c) provides that "[i]n any proceeding under subsection (b) of this section, there shall be a presumption, rebuttable only by a clear preponderance of the evidence, that the findings of fact made by the arbitrator were correct." The statute does not provide a standard of review for the arbitrator's findings of law, but the Tenth Circuit has held that "district courts review the arbitrator's legal conclusions de novo." *Trustees of Colorado Pipe Indus. Pension Trust v. Howard Elec. & Mech. Inc.*, 909 F.2d 1379,

6

1386 (10th Cir. 1990).

The Tenth Circuit has not laid out a standard of review applicable to mixed questions of law and fact in the MPPAA context.  However, as a general matter, the circuit looks to whether considerations of fact or those of law predominate: "Where the mixed question involves primarily a factual inquiry, the clearly erroneous standard is appropriate.  If, however, the mixed question primarily involves the consideration of legal principles, then a de novo review by the appellate court is appropriate."  *Supre v. Ricketts*, 792 F.2d 958, 961 (10th Cir. 1986) (citing Ninth Circuit precedent).  The Ninth Circuit has adopted this approach in the MPPAA context, *see United Foods, Inc. v. W. Conference of Teamsters Pension Trust Fund*, 816 F. Supp. 602, 607 (N.D. Cal. 1993) *aff'd*, 41 F.3d 1338 (9th Cir. 1994), and this Court will do the same.[4]  *See also RXDC, Inc. v. Oil, Chem. & Atomic Workers Union-Indus. Pension Fund*, 781 F. Supp. 1516, 1522–23 (D. Colo. 1992) (taking a similar approach).

Before reviewing the arbitrator's conclusions, the Court must determine the appropriate standard of review with respect to each issue.  The defendant/counter-plaintiffs argue that the arbitrator erred in finding that (1) Ceco did not incur withdrawal liability under a "common control" theory when Heico acquired CFA, (2) Ceco and CFA were not a "single employer," and (3) Ceco's sale of work to avoid liability did not require that it be deemed to have performed the work.  Determining the appropriate standard for each issue requires the Court to decide whether each finding turns only on a legal conclusion, is solely a factual determination, or involves a mixed question of law and fact.

---

[4] Courts in other jurisdictions have applied a "clear error" standard of review to all mixed question of law and fact under the MPPAA.  *See, e.g.*, *Chicago Truck Drivers, Helpers & Warehouse Workers Union (Indep.) Pension Fund v. Louis Zahn Drug Co.*, 890 F.2d 1405, 1411 (7th Cir. 1989) ("[W]e shall review the arbitrator's resolution of mixed questions under the clearly erroneous standard."); *666 Drug, Inc. v. Tr. of 1199 SEIU Health Care Employees Pension Fund*, No. 12 CIV. 1251 PAE, 2013 WL 4042614, at *5 (S.D.N.Y. Aug. 8, 2013), *appeal dismissed (Oct. 1, 2013)*, *aff'd*, 571 F. App'x 51 (2d Cir. 2014).  However, the Court is convinced that the Ninth Circuit approach is more in line with Tenth Circuit case law.

In making this determination, the Court must first consider the implications of the Supreme Court's language in *Concrete Pipe & Products of California, Inc. v. Constr. Laborers Pension Trust for S. California*, 508 U.S. 602, 630 (1993). In that case, the Court held that

> determining the date of "complete withdrawal" presents not a mere question of fact . . . , but a mixed question of fact and law. The relevant facts are about the closure of the Shafter plant (such as the intent of Concrete Pipe with respect to the plant, its expression of that intent, its activities while the plant was not operating, and the circumstances of the plant's reopening), while the question whether these facts amount to a "complete withdrawal" is one of law.

*Concrete Pipe*, 508 U.S. at 630. The Plan/the Board contend that this language suggests that the determination of whether a withdrawal occurred in this case is a question of law, ECF No. 42 at 1–2, while Ceco asserts that it implies that the issues before this Court are mixed questions of law and fact, ECF No. 41 at 1. Indeed, courts have interpreted the quoted language in both ways. *See, e.g.*, *Penn Cent. Corp. v. W. Conference of Teamsters Pension Trust Fund*, 75 F.3d 529, 533 (9th Cir. 1996) ("Whether a withdrawal within the meaning of the statute has occurred presents a mixed question of law and fact.") (citing *Concrete Pipe*); *Trustees of Utah Carpenters' & Cement Masons' Pension Trust v. Loveridge*, No. 2:10-CV-00809-DS, 2012 WL 2522596, at *4 (D. Utah June 28, 2012), *aff'd* (June 10, 2014) ("The question of whether a complete withdrawal occurred . . . is . . . one of law.") (citing *Concrete Pipe*).

Rather than adopting an approach that would classify all of the issues in this case as either legal or mixed questions, the Court instead will consider each of the arbitrator's findings individually in determining the appropriate standard of review. The Court believes that this approach is in line with the analysis in *Concrete Pipe*, which aims to isolate purely factual and purely legal issues to the extent possible. Indeed, the statute itself contemplates a distinct standard of review for factual matters, *see* 29 U.S.C §1401(c), and, as the Seventh Circuit has explained, "contrary to the usual scheme in arbitration matters, Congress did intend that all legal

determinations by an arbitrator [under the MPPAA] be subject to de novo review.  Consequently, the parties have a right to expect that the reviewing court will scrutinize fully the arbitrator's understanding of the underlying legal principles." *Chicago Truck Drivers, Helpers & Warehouse Workers Union (Indep.) Pension Fund v. Louis Zahn Drug Co.*, 890 F.2d 1405, 1411 (7th Cir. 1989).  With these principles in mind, the Court now turns to an examination of whether the arbitrator's findings here involve law, fact, or mixed questions.

First, the arbitrator found that, on the parties' stipulated facts, ERISA's "common control" provision, 29 U.S.C. § 1301(b)(1), did not require that CFA's work be considered Ceco's work for purposes of determining withdrawal liability.  UR at 95.  The opinion discusses four reasons in support of this conclusion: (1) the date on which an employer ceased to have an obligation to contribute to the Plan is the date on which withdrawal liability is determined, (2) the only case the Plan cited to support its argument did not in fact do so, (3) the Pension Benefit Guaranty Corporation's ("PBGC") regulations on abatement did not provide any support for the Plan's theory, and (4) finding that CFA's work could not be attributed to Ceco would not lead to absurd results.  *Id.* at 95–98.  All four of these reasons are undoubtedly legal conclusions, a determination further underscored by the fact that the arbitrator's findings were based on stipulated facts.  *See Technical Metallurgical Servs., Inc. v. Plumbers & Pipefitters Nat. Pension Fund*, 213 F. App'x 268, 270 (5th Cir. 2007) ("[If] the parties stipulate[] to the facts before the arbitrator, . . . there remains only a question of law.").  Thus the Court will review the arbitrator's "common control" analysis de novo.

Second, the arbitrator found that CFA and Ceco could not be considered a single employer.  UR at 1118.  Despite the two companies' common ownership, he concluded that the other three factors relevant to the analysis weighed against finding single employer status.  First,

there was no interrelation of operations between Ceco and CFA. *Id.* at 1118–19. Second, "[t]aken as a whole, the evidence [did] not support a finding that Ceco and CFA had common management." *Id.* at 1119. Finally, in the arbitrator's opinion, "[t]he credible evidence demonstrates that there was no centralized control of labor relations." *Id.* at 1120. This analysis on the whole is fact-intensive, and, as other courts have recognized, "[t]he resolution of this question is essentially a factual issue." *S. Elec. Health Fund v. Kelley*, 308 F. Supp. 2d 847, 867 (M.D. Tenn. 2003) *aff'd sub nom. S. Elec. Health Fund v. Heritage Mut. Ins. Co.*, 147 F. App'x 497 (6th Cir. 2005). *See also Carnival Carting, Inc. v. N.L.R.B.*, 455 F. App'x 20, 22 (2d Cir. 2012) ("The determination of single employer status is a question of fact."). Thus the Court will presume that the arbitrator's conclusion is correct, unless contradicted by a clear preponderance of the evidence.

Finally, the arbitrator found that Ceco sold work back to a contractor to avoid performing work in Colorado after its obligation to contribute to the Plan ended. UR at 1121. Because its principal purpose was to avoid or evade liability, the transaction had to be disregarded under ERISA §4212(c), 29 U.S.C. § 1392(c). *Id.* As the Seventh Circuit has explained, whether a transaction was undertaken with the purpose of evading or avoiding liability is a "classic example[]" of a mixed question of law and fact.[5] *Zahn*, 890 F.2d at 1409. Furthermore, the arbitrator's finding involves a primarily factual inquiry focused on the reasons Ceco undertook the transaction at issue. For this reason, the Court will consider the arbitrator's finding on the purpose of the sell-back transaction under the clearly erroneous standard.

Turning to the legal implication of this finding, the Plan argued that disregarding the

---

[5] One could argue that, under *Concrete Pipe*, once the relevant facts have been established, only a legal question about whether those facts amount to the purpose of evading or avoiding liability remains. *See* 508 U.S. 602, 630. However, the Court is not persuaded by that approach. Unlike the determination of whether particular facts amount to a withdrawal, reaching a conclusion about the purpose of a transaction involves an analysis much closer to the facts. Indeed, it would be difficult to fully separate out the factual and legal questions in this instance. Thus the Court find the Seventh Circuit's reasoning in *Zahn* convincing, even in light of the language in *Concrete Pipe*.

transaction required that Ceco be deemed to have performed the work it avoided by selling it

back.  UR at 1121–22.  However, the arbitrator found the case the Plan cited in support of its

position distinguishable and instead concluded that he was not required to deem Ceco to have

completed the work at issue.  *Id.* at 1122.  The arbitrator went on to discuss two additional

arguments that Ceco made in support of its position, apparently embracing one and declining to

address the other.  *Id.* at 1123–24.  Determining the legal consequence of finding that Ceco's

transaction was undertaken to avoid or evade liability is a matter of law alone; whether the

arbitrator was correct in declining to deem that Ceco had completed the work turns not on any

factual matter, but rather on his interpretation of the relevant law.  For these reasons, the Court

will review the implications of the avoid-or-evade finding de novo.

### C.  **The Arbitrator's Conclusions.**

Keeping the applicable standards of review in mind, the Court now turns to the merits of

the arbitrator's conclusions.  As discussed above, the Plan made three arguments for why Ceco

should be subject to withdrawal liability for continuing or resuming work in Colorado after it

ceased to have an obligation to contribute to the Plan.  The arbitrator found none of them

convincing.  The Court will review each issue in turn.

### 1.  **Common Control.**

The Court reviews de novo the arbitrator's conclusion that CFA's work should not be

considered Ceco's work on a "common control" theory for purposes of determining withdrawal

liability.  Under the construction industry exception, an "employer" incurs withdrawal liability if,

after it ceases to have an obligation to a plan, it "continues to perform work in the jurisdiction of

the collective bargaining agreement of the type for which contributions were previously required,

or (ii) resumes such work within 5 years after the date on which the obligation to contribute

under the plan ceases, and does not renew the obligation at the time of the resumption." ERISA § 4203(b)(2), 29 U.S.C. § 1383(b)(2). For purposes of determining what constitutes an "employer," "all employees of trades or businesses (whether or not incorporated) which are under common control shall be treated as employed by a single employer and all such trades and businesses as a single employer." ERISA § 4001(b)(1), 29 U.S.C. § 1301(b)(1).

At issue here is whether the "common control" provision encompasses only those firms under common control on the date an employer's obligation ends or whether, for purposes of the construction industry exception, it also includes any firms that come under common control at a later date. The parties agree that Ceco ceased to have an obligation to contribute to the Plan on May 1, 2010. UR at 101 ¶ 4. At that time, Ceco and Heico were under common control. *Id.* at 100 ¶ 3. Five months later, on October 1, 2010, Heico acquired CFA, bringing all three entities under common control. *Id.* at 101 ¶¶ 7, 8. The parties agree that CFA was at that time (and continues to be) performing work in Colorado of the type for which contributions from Ceco were previously required. *Id.* at 101 ¶ 6. The arbitrator found that only the entities under common control on May 1 should be considered in determining Ceco's liability, *id.* at 99; the Plan/the Board argue that any entity that comes into common control with the withdrawing employer during the following five years should be considered when determining if Ceco has resumed work in the jurisdiction.

The Court agrees with the arbitrator's reasoning. Under ERISA § 4203(b)(2), 29 U.S.C. § 1383(b)(2), the "employer" that withdrew from the Plan on May 1, 2010 will incur withdrawal liability if that employer resumes work in the jurisdiction within five years. ERISA § 4001(b)(1), 29 U.S.C. § 1301(b)(1) makes clear that the term "employer" here refers to the all of the entities under common control with the withdrawing one. Here, that includes Ceco and

Heico, but not CFA.  Thus the Court considers only whether Ceco and Heico themselves have

resumed work within the jurisdiction.  The statute gives no indication that the entities which

constitute the employer subject to the five-year period in ERISA § 4203(b)(2) must be

continually reevaluated, and the court will not read in such a requirement.[6]

This conclusion is further underscored by the fact that identification of which entities are

jointly and severally liable for withdrawal liability turns on which entities were under common

control on the date of withdrawal.  Under ERISA § 4001(b)(1), 29 U.S.C. § 1301(b)(1), all

members of a "common control" group of trades or businesses are jointly and severally liable for

the withdrawal liability incurred by any member.  *Board of Trustees v. Lafrenz*, 837 F.2d 892,

893 (9th Cir.1988).  In determining which entities can be assigned liability under this provision,

> a MPPAA employer's relationship with other trades or businesses following
> withdrawal is not relevant to withdrawal liability.  Withdrawal liability is imposed
> only on those trades and businesses that are under common control with the
> withdrawing employer on the date of withdrawal.  A trade or business that
> becomes part of a controlled group with the employer *after* the withdrawal has no
> obligation to contribute and is never a contributing MPPAA employer.

*Teamsters Pension Trust Fund of Philadelphia v. Brigadier Leasing Associates*, 880 F. Supp.

388, 396 (E.D. Pa. 1995) (emphasis in original).  I agree with that court's interpretation.  If CFA

cannot be held liable for any withdrawal liability Ceco might incur, it does not make sense to

make Ceco's liability turn on Heico's acquisition of CFA.

Furthermore, the purposes underlying the "common control" provision do not support the

Plan/the Board's position.  As the Seventh Circuit has explained, "[t]he main purpose of [the

common control] rule is to prevent a business subject to an unfulfilled pension debt from

'fractionalizing its operations' or shifting assets to related companies to avoid meeting its

---

[6] The defendant/counter-plaintiffs briefly argue that the plain language of the statute supports their position.  ECF
No. 39 at 15.  The Court finds no merit in this argument.  Indeed, the Court finds that language alone lends more
support to Ceco's position.

financial obligations to the plan." *Cent. States, Se. & Sw. Areas Pension Fund v. Johnson*, 991

F.2d 387, 388 (7th Cir. 1993).  There is nothing in the record to suggest that the present case

involves an employer attempting to dodge liability through corporate restructuring; rather, it

involves a later acquisition undertaken for reasons unrelated to potential withdrawal liability.

Indeed, even the legislative history that defendant/counter-plaintiffs quote in their motion

describes a purpose not served by holding Ceco liable here:

> [T]he term "employer" [should] be construed in a manner consistent with the bill
> and its purposes.  We intend that employers not be able to evade or avoid
> withdrawal liability through changes in identity, form, or control, or through
> transactions which are less than bona fide and arms length.  Hence, for example, a
> building and construction industry employer . . . will not be able to evade
> withdrawal liability by going out of business and resuming business under a
> different identity.

ECF No. 39 at 9 (quoting 126 Cong. Rec. 23038).  None of this describes the present scenario.

Rather than changing its corporate form or going out of business and emerging as a new entity,

Heico acquired an existing firm already operating in Colorado.  The purposes of the "common

control" provision would not be served by discouraging such acquisitions.

The defendant/counter-plaintiffs' arguments do not convince the Court otherwise.  First,

the Plan/the Board argue that the PBGC has interpreted essentially the same statutory language at

issue here to include after-acquired control group entities in the definition of "employer."  ECF

No. 39 at 13–14.  Specifically, ERISA § 4207(a), 29 U.S.C. § 1387(a), provides that the PBGC

shall issue regulations providing for "the reduction or waiver of liability for a complete

withdrawal in the event that an employer who has withdrawn from a plan subsequently resumes

covered operations under the plan . . . to the extent that the [PBGC] determines that reduction or

waiver of withdrawal liability is consistent with the purposes of this chapter."  The

defendant/counter-plaintiffs argue that because the PBGC has decided that newly-acquired

control group entities should be included in determining if an employer has resumed operations after a withdrawal, this Court should similarly consider after-acquired entities in determining if an employer has resumed work in the present context. ECF No. 39 at 13–14.

As the arbitrator explained, this reasoning is not persuasive. In promulgating regulations under the abatement provision of ERISA cited above, the PBGC was concerned primarily with maximizing the incentives for withdrawn employers to reenter plans:

> To avoid restricting the benefits of this rule, and thus the incentive for past contributors to reenter, the definition does not deny abatement if the controlled group also includes new entities. Thus, if the withdrawn employer merges with or acquires another corporation, the combined entity is the eligible employer; any part of it can qualify for abatement, because the controlled group includes all entities that are liable for the complete withdrawal.

51 Fed. Reg. 10300, 10303–04. This reasoning bears no relation to the present context, in which the Plan seeks to impose liability on a withdrawn employer based on work performed by an entity that later came under common control. Although the Plan/the Board are correct that identical words in different parts of a statute are intended to have the same meaning, the statute here specifically instructs the PBGC to issue regulations providing for reduced liability to the extent that doing so "is consistent with the purposes of this chapter." 29 U.S.C. § 1387(a). The regulations issued pursuant to this directive thus do not have the same weight that they otherwise might in interpreting the provision at issue in the present case. For this reason, the Court finds the Plan/the Board's argument based on the abatement regulations unpersuasive.

Second, the defendant/counter-plaintiffs argue that the law on subcontractors in this context supports their position. ECF No. 39 at 14–15. They point to *H.C. Elliott, Inc. v. Carpenters Pension Trust Fund for N. California*, in which the Ninth Circuit found that an employer resumed work in the relevant jurisdiction by hiring a subcontractor to perform the type of work for which contributions were previously required. 859 F.2d 808, 813 (9th Cir. 1988).

15

However, there are important differences between that case and the one presently before the Court. In *H.C. Elliott*, the agreement itself made clear that the employer "was responsible for payments to the pension fund for all work done either by its own employees or by its subcontractors' employees." *H.C. Elliott, Inc*, 859 F.2d at 813. Thus the work at issue in that case was explicitly covered by the employer's agreement with the Plan. Furthermore, hiring a subcontractor to perform particular work is much more akin to hiring employees to perform it than acquiring another firm that also does that type of work. For these reasons, the Court is not persuaded by the Plan/the Board's argument that newly acquired subsidiaries should be treated the same as recently hired subcontractors.

In sum, the Court reads the statute to require only that the entities under common control with the withdrawing employer on the date of withdrawal do not themselves resume work within five years, not that they additionally refrain from acquiring any other entity that performs the same type of work. Thus the Court does not find a basis for withdrawal liability in the Plan/the Board's "common control" theory.

**2.  <u>Single Employer Status</u>.**

The Court reviews the arbitrator's factual finding that Ceco and CFA were not a single employer under the presumption that it is correct. Applying the four-factor test to determine if two employers should be treated as one, the arbitrator found that Ceco and CFA had common ownership, but lacked interrelation of operations, common management, and centralized control of labor relations. UR at 1118–21. He thus concluded that they should not be treated as a single employer. *Id.* The Court has reviewed the arbitrator's opinion and finds that it is not contradicted by a preponderance of the evidence.

The Plan/the Board argue that the arbitrator's analysis rests on an improper legal standard

because he did not rely on the Tenth Circuit's *Knowlton* opinion. ECF No. 39 at 16. In that case, after reciting the four-factor test applied by the arbitrator here, the court commented that "[a]ll four factors, however, are not necessary for single-employer status. Rather, the heart of the inquiry is whether there is an absence of an arm's-length relationship among the companies." *Knowlton v. Teltrust Phones, Inc.,* 189 F.3d 1177, 1184 (10th Cir. 1999). Defendant/counter-plaintiffs appear to argue that with this language the Tenth Circuit introduced a separate—and controlling—factor into the traditional single-employer test. *See* ECF No. 39 at 16–18. They misread the case. The court in the quoted section does nothing more than emphasize that every factor need not be met, because the factors are themselves merely ways of getting at the ultimate question of the absence of an arm's length relationship.[7] The Plan/the Board's argument that the four-factor test is secondary to a separate "arms' length relationship" test is not persuasive.[8]

For these reasons, the Court upholds the arbitrator's single-employer analysis and declines to find that withdrawal liability exists on this basis.

### 3.  The Transaction Designed to Evade or Avoid Liability.

The Court reviews for clear error the arbitrator's finding that Ceco's selling work back to a contractor is a transaction covered by the "evade or avoid" prohibition of the MPPAA, ERISA § 4212(c), 29 U.S.C. § 1392(c). Given the clear evidence the arbitrator cites (testimony from Ceco's district manager about the purpose of the transaction), the Court finds that this conclusion

---

[7] Indeed, later Tenth Circuit opinions are consistent with this Court's reading of *Knowlton. See, e.g., Calvert v. Midwest Restoration Servs., Inc.,* 35 F. App'x 798, 802 (10th Cir. 2002).

[8] Furthermore, the defendant/counter-plaintiffs misrepresent the arbitrator's statement about Ceco and CFA's sharing of assets. In analyzing whether any interrelation of operations between Ceco and CFA existed, the arbitrator wrote: "Nor is the evidence Ceco and CFA share assets on a non-arm's length basis indicative of an interrelation of operations." UR at 1119. This single observation about Heico-owned companies' practice of renting each other equipment at below-market rates does not imply that the relationship between Ceco and CFA is not an "arms-length" one on the whole.

was not clearly erroneous.[9]

Turning now to the legal implication of this finding, the Court reviews de novo the arbitrator's conclusion that disregarding the transaction does not require that Ceco be deemed to have performed the work it sold back.  The relevant MPPAA provision states that "[i]f a principal purpose of any transaction is to evade or avoid liability under this part, this part shall be applied (and liability shall be determined and collected) without regard to such transaction."  29 U.S.C. § 1392(c).  The statute does not make clear what the legal effect of disregarding a transaction is in a case like the present one.  The arbitrator found that because Ceco did not in fact perform any work in the jurisdiction, disregarding the transaction did not trigger withdrawal liability.  UR at 1122.  The Plan/the Board argue that had the sell-back transaction not occurred, Ceco would have performed the work and incurred liability.  ECF No. 39 at 19–20.  Thus the Court is faced with the task of determining what course of action Ceco would have taken had it not engaged in the offending transaction.

In doing so, the Court must aim to put the parties "in the same situation as if the offending transaction never occurred; that is, to erase that transaction.  [§ 1392(c)] does not, by contrast, instruct or permit a court to take the affirmative step of writing in new terms to a

---

[9] Ceco relies on the language in *Robbins v. Pepsi-Cola Metro. Bottling Co.*, 636 F. Supp. 641, 656–57 (N.D. Ill. 1986), that "all businesses should be entitled to guide their conduct in accordance with the specific exemptions provided by Congress" to argue that an employer can deliberately structure a transaction to avoid liability under the construction industry exemption.  ECF No. 38 at 16–17.  However, the reasoning in *Robbins* is inapplicable here. Nothing in the MPPAA suggests that 29 U.S.C. § 1392(c) does not apply when a transaction that would otherwise be deemed to have a principal purpose of avoiding or evading liability is undertaken in order to qualify for the construction industry exemption.  Ceco's contention that the arbitrator's analysis "completely eviscerate[s] the statutory exemption for the building and construction industry, except in cases where the employer could establish that the application of the exemption was purely accidental, or in cases where the employer acted unilaterally by engaging in a strategic default on its contractual obligations" is misguided.  ECF No. 38 at 17.  Instead, the statute requires that, in order to avoid having a transaction be disregarded under 29 U.S.C. § 1392(c), an employer plan its withdrawal such that it has no future obligations to perform work in the jurisdiction (or, as in this case, establish that it would not have performed the work regardless of the transaction).  The construction industry exception is designed to allow employers who cease all operations in a given jurisdiction to avoid withdrawal liability—a policy Congress created in recognition of the transitory nature of work in the construction industry.  Interpreting 29 U.S.C. § 1392(c) to require that an employer in fact perform all of its existing obligations before withdrawing from a plan pursuant to this exception fits with the overall purpose of the policy.

18

transaction or to create a transaction that never existed." *Sun Capital Partners III, LP v. New England Teamsters & Trucking Indus. Pension Fund*, 724 F.3d 129, 149 (1st Cir. 2013) *cert. denied*, 134 S. Ct. 1492 (2014). Instead, courts generally look to any facts the parties have presented about what would have likely taken place had the transaction at issue not occurred. *See, e.g.*, *id.* (considering then rejecting the argument that a particular alternative transaction would have taken place had the actual transaction not occurred); *SUPERVALU, Inc. v. Bd. of Trustees of Sw. Pennsylvania & W. Maryland Area Teamsters & Employers Pension Fund*, 500 F.3d 334, 343 (3d Cir. 2007) (after disregarding a termination agreement, turning to the collective bargaining agreements that would have otherwise governed).

Applying this approach in the present case is complicated by the fact that the situation that the parties would have been in without the offending transaction depends critically on the action Ceco would have taken. Had selling the work back not been an option, Ceco either could have performed it, thus incurring withdrawal liability, or strategically defaulted on its contract, thus avoiding the liability. As the arbitrator pointed out, regardless of why it did not perform the work, Ceco did not in fact do so, and thus deeming it to have done so requires quite a leap from the actual facts.[10]

Furthermore, the only evidence the parties have cited on this point is Ceco's testimony at the arbitration hearing:

> Well, we hadn't sold any new work, and we knew that, again, with our plan to move forward and accepting that—and paying that withdrawal liability, what we didn't want to do was trigger that liability by working what we would call insignificant work with no profit. It was just some final work that we had, as I mentioned, topping slabs and stair work. It wasn't significant. Rather than do

---

[10] As the Sixth Circuit has put it, "[t]here is no congressional mandate to engage in legal gymnastics in order to guarantee pension plans at all costs[,] . . . or to apply the statute in a nonsensical fashion in order to assure full payment of withdrawal liability." *Teamsters Pension Trust Fund of Phila. & Vicinity v. Cent. Mich. Trucking, Inc.*, 857 F.2d 1107, 1109 (6th Cir. 1988). It seems to this Court that deeming Ceco to have undertaken actions which it did not in fact undertake would amount to such legal gymnastics.

that, our plan was to fund that liability out of new work that we were able to sell under this new structure, and obviously, the goal would be to sell that—or to pay that out of profitable work.

UR at 140–41.  The Plan/the Board argue that because this testimony does not mention strategic default as an option, Ceco planned either to perform the work or sell it back; thus the Court should deem Ceco to have performed it.  ECF No. 39 at 20.  However, the overall gist of the testimony is that Ceco wanted to avoid incurring withdrawal liability for insignificant, unprofitable work.  Even viewing this testimony in the light most favorable to the Plan/the Board, given Ceco's overall objective of avoiding liability, it is clear that it is more likely that Ceco would have strategically defaulted than that it would have incurred liability by completing this single, unprofitable project.  Thus the evidence suggests that Ceco would not have performed the work in question regardless of the sell-back transaction.

Finally, the defendant/counter-plaintiffs argue that not deeming Ceco to have completed the work creates a presumption that it would have found another way to escape liability.  ECF No. 39 at 20.  This argument is misguided.  As an initial matter, assuming that Ceco would not have performed the work does not turn on any presumption, but rather draws on the facts of the case.  Furthermore, assuming instead that Ceco would have performed the work creates the paradoxical result that Ceco could have avoided liability by defaulting on its contractual obligations, but not by entering a new contract to sell back the work.  If that were the result, the law would create an incentive for employers in Ceco's position to strategically default and wait to be sued by their counterparties, creating unnecessary litigation and needlessly complicating employers' cessation of activities in a jurisdiction.  Thus the Court is not persuaded by defendant/counter-plaintiffs' characterization of this result.

For the reasons explained above, the Court agrees with the arbitrator that disregarding the

transaction in which Ceco sold back work does not require that Ceco be deemed to have completed the work. Ceco therefore did not incur withdrawal liability on this basis.

## IV.  CONCLUSION

Congress enacted the MPPAA to ensure that employers withdrawing from multiemployer pension plans would not place the plans in financial distress. However, Congress also recognized that work the construction industry is transitory by nature and created an industry-specific exception. Ceco's withdrawal from the Plan in this case falls squarely into that exception. Despite the Plan/the Board's attempts to argue otherwise, the undisputed facts show that Ceco did not resume work in Colorado by coming under common control with CFA, the two were not a single employer, and Ceco's selling work back to a contractor does not require that it be deemed to have completed the work.

Ceco also requests an award of attorney's fees pursuant to ERISA § 4301(e), 29 U.S.C. § 1451(e), which states that "[i]n any action under this section, the court may award all or a portion of the costs and expenses incurred in connection with such action, including reasonable attorney's fees, to the prevailing party." The statute does not provide any guidance in determining when to award costs and expenses, and there is no Tenth Circuit case considering the issue. This Court will follow the approach taken by a district court in Utah, which considered the following factors in deciding whether to award fees:

> the degree of the opposing parties' culpability or bad faith, the ability of the opposing parties to personally satisfy an award of attorney's fees, whether an award of attorney's fees against the opposing parties would deter others from acting under similar circumstances, whether the parties requesting fees sought to benefit all participants and beneficiaries of an ERISA plan or to resolve a significant legal question regarding ERISA, [and] the relative merits of the parties' positions.

*Trustees of Utah Carpenters' & Cement Masons' Pension Trust v. Loveridge*, No. 2:10-CV-

00809-DS, 2013 WL 3994677, at *1 (D. Utah Aug. 5, 2013) *aff'd*, 567 F. App'x 659 (10th Cir.

2014).  The present action involved significant legal questions about the applicability of certain

ERISA provisions, and the Court does not find that the Plan/the Board challenged the arbitrator's

findings in bad faith.  While the Court does not ultimately agree with the Plan/the Board's

positions, they are not wholly unreasonable.  Although the Plan could likely satisfy an award of

fees, the balance of the factors weighs in the Plan/the Board's favor.  For these reasons, the Court

declines to award fees and expenses to the plaintiff/counter-defendant in this case.

## ORDER

For the foregoing reasons, the Plaintiff/Counter-Defendant's Motion for Summary

Judgment [ECF No. 38] is GRANTED, and the Defendant/Counter-Plaintiffs' Motion for

Summary Judgment [ECF No. 39] is DENIED.  It is further ORDERED that:

1. The June 7, 2013 Final Award (including the Interim Award incorporated by

   reference therein) entered by Arbitrator Brand is affirmed.

2. The Defendant is required to refund all withdrawal liability payments made by

   Plaintiff/Counter-Defendant, together with interest from the date of each quarterly

   payment pursuant to 29 C.F.R. § 4219.31(d).

3. Plaintiff/Counter-Defendant's request for costs and expenses, including reasonable

   attorney's fees, pursuant to ERISA § 4301(e), 29 U.S.C. § 1451(e) is DENIED.

DATED this 18th the day of December, 2014.

BY THE COURT:

_____
R. Brooke Jackson
United States District Judge

22